## Moore *v*. Ziba Bennitt & Company.

### Opinion delivered January 31, 1921.

1. EVIDENCE—PAROL EVIDENCE TO EXPLAIN AMBIGUOUS CONTRACT.— Where a contract for the sale of cotton was ambiguous in respect to whether the seller was acting as agent for his mother, parol evidence was admissible on the issues whether the seller was acting as agent and whether he had authority, real or apparent, to make the sale.

2. PRINCIPAL AND AGENT—RELATIONSHIP SHOWN BY CIRCUMSTANCES. —While the relation of principal and agent can not be presumed and can not be established by the acts or declarations of the agent in assuming authority, yet such relation and the authority of the agent, after the relation is proved, can be shown by circumstances as well as by positive proof.

3. PRINCIPAL AND AGENT.—Evidence *held* to warrant a finding that defendent had constituted her son her general agent to sell cotton grown on her plantation.

4. PRINCIPAL AND AGENT—APPARENT AUTHORITY.—Where a defendant permitted her son to make numerous sales of her cotton to cotton buyers, many of them to plaintiff, the latter had a right to conclude that the son was authorized to make a contract of sale of her cotton.

5. SALES—BREACH BY SELLER—DAMAGES.—Where a seller of cotton violated her contract, the measure of the buyer's damages was the difference between the contract price and the reasonable market value of the cotton at the place and on the date that same should have been delivered with interest at 6 per cent. from that date.

6. SALES—CONSTRUCTION OF CONTRACT.—It is the duty of the court to construe a contract of sale if possible so as to effectuate the intention of the parties.

7. SALES—VALIDITY OF CONTRACT.—Where a contract of sale of 200 bales of cotton contemplated that, if the cotton were delivered in two lots as it was picked, the seller should receive for the first hundred bales 46 cents per pound, and for the second hundred bales 45 cents per pound, or if the entire two hundred bales were delivered in one lot that she should receive 45½ cents a pound, the contract was not void for uncertainty.

Appeal from Jefferson Circuit Court; *W. B. Sorrells,* Judge; affirmed.

*M. Danaher* and *Palmer Danaher,* for appellant.

1. Carter Murphy, who signed the contract, was not appellant's agent nor was he authorized to make the agreement for her. There is no testimony that appellant authorized Carter to make this sale nor that she held him out as her agent. The writing was signed by Murphy alone, not as "agent," and there is no testimony that appellant held Murphy out as her agent with her knowledge. The agent only was bound, and not the principal. 2 C. J. 670, par. 321; *Ib.* 682. The writing was not the contract of the principal, and she is not bound. 2 C. J. 679; 17 Ind. 495; 17 Am. Dec. 529; 25 Am. Rep. 199; 52 Am. Dec. 771; 46 *Id.* 238; 66 Ark. 10; 55 *Id.* 423. The authority of the agent will not be presumed and can not be proved by mere acts and declarations of the agent; authority must be proved by positive proof or by circumstances showing the assent of the principal. 126 Ark. 405; 105 *Id.* 446; 132 *Id.* 155; 105 *Id.* 450; 2 C. J. 436-8; 53 Ark. 208; 105 *Id.* 148. There is no evidence of any agency of Murphy, and the former transactions should not have been admitted in the evidence. 105 Ark. 449; 61 N. Y. S. 727; 56 Ark. 221. Authority can not

be implied from proof of authority in a particular instance. 2 C. J. 592, 920. Agency can not be established by proof of similar transactions with others in no way connected with the transaction in question. 2 C. J. 948; 4 So. 34. The testimony of A. W. Nunn was inadmissible. 2 C. J. 587-8; 130 N. Y. S. 136. It was not shown that appellant knew of these transactions. 2 C. J. 947. It was error to allow witnesses to testify that Murphy was appellant's agent. The facts alone were admissible. 110 Ark. 90.

2. The contract is void for uncertainty. 159 S. W. 82.

3. The instructions were error as given. The defendant's tenth should have been given. 2 C. J. 564; 62 Ark. 33; 94 *Id.* 305.

4. There was no ratification. 3 Cyc. 255; 55 Ark. 423; 216 S. W. 20; 19 N. H. 369. Appellant was in no manner responsible for Murphy's lack of information or negligence. 1 Mechem on Agency (2 ed.) 297.

*Bridges & Wooldridge* and *Coleman & Gantt,* for appellee.

1. Murphy was appellant's agent, as the testimony proves. To deny his agency would be a fraud on innocent parties and can not be allowed. Mechem on Agency, § 283.

2. One who holds out another as his agent is bound by his acts. Mechem on Agency, §§ 83-4; 41 N. E. 888-91; 53 Ark. 208. One dealing with an agent, in the absence of notice to the contrary, has the right to presume he is a general agent. 103 Ark. 79; 132 *Id.* 171; 107 *Id.* 322; 100 *Id.* 240-4; 112 *Id.* 68; 219 S. W. 319; 131 Ark. 197. The intention was to bind the principal. 2 C. J. 670, § 322; *Ib.* 813, § 437; 101 U. S. 392; 1 Williston on Contracts, §§ 287, 295. See, also, 10 N. W. 433-4; 65 N. Y. S. 225.

3. Parol evidence was admissible to show that the principal was bound where the contract is in the name

of the agent. 43 Pac. 378; 117 N. E. 526-7; 60 Pac. 339; 216 S. W. 20; 142 *Id.* 1150; 25 R. C. L. 657, 686.

4. Bennett's testimony as to purchases of cotton prior to the one in question was admissible. 21 R. C. L. 858; 96 Pac. 48; 17 L. R. A. (N. S.) 239. The relation of principal and agent may be shown by circumstances and parol proof. 83 N. E. 773; 94 N. W. 427; 69 *Id.* 927. Previous dealings are admissible to show notice. 78 Ark. 327; 99 S. E. 490. Where evidence tends to show agency, it is evidence for a jury to pass upon. 21 R. C. L. 820; 111 N. W. 119; 21 R. C. L. 821-2.

5. Although evidence is not full or satisfactory, the better practice is to submit it to a jury. 21 R. C. L. 821-2.

The instructions given cover the case and have been approved by this court, and those refused were sufficiently covered by those given. 134 Ark. 284.

It is the duty of courts to so construe contracts as to uphold them. 13 C. J. 539; 2 Williston on Cont., 1202, § 620. If there is a conflict in the provisions of the contract, the first will prevail and the last be rejected. 34 Atl. 648-52. Murphy's authority was fairly submitted to a jury on proper instructions, and their decision is final. 93 Ark. 600; Mechem on Agency, § 106. Where there is a ratification as here, it is unnecessary to prove agency. 139 N. W. 101. To repudiate an agency notice must be given. 90 S. W. 737. Ratification was shown. 8 Pick (Mass.) 9; 78 Atl. 379-81; 93 Pac. 577. Appellant had knowledge of the acts of the agent and did not object, and hence there was ratification. 80 N. W. 520; 116 N. W. 611. Appellant was silent after the acts of the agent were known and is bound. 11 Ark. 189; 96 *Id.* 505; 124 *Id.* 360. Appellant did not disaffirm the contract and is bound. 11 N. E. 700.

WOOD, J. The appellee, an Arkansas corporation, engaged in the business of buying and selling cotton in the city of Pine Bluff, Arkansas, brought this action against the appellant. The appellee alleged that the ap-

pellant for many years had been a planter engaged in the growing and selling of cotton; that Carter Murphy, appellant's son, had been for many years her duly authorized agent through whom she had sold the cotton and cotton seed grown by her; that Carter Murphy sold and agreed to deliver to the appellee the first two hundred bales of cotton picked on appellant's plantation at Fairfield, Arkansas, for the price of 45½ cents per pound; that it was agreed that each of the bales should weigh five hundred pounds and should be delivered to the appellee on board the cars at the compress in Pine Bluff as quickly as possible after the date of the agreement, and that the appellee should pay for the same according to the compress weight; that the cotton was ready for delivery October 29, 1919; that appellant had failed to deliver the same; that appellee had at all times been ready and willing to receive and pay for the cotton according to the contract; that appellee, relying on the contract, had contracted to sell the cotton and would be compelled to buy other cotton of the same grade and staple to comply with its contracts; that the market price of the cotton on the day the same should have been delivered was 75 cents per pound; that the difference between the price at which appellant agreed to sell the cotton and the market price of the cotton at the time when the same should have been delivered was 29½ cents per pound, or a total of $29,500, which the appellee had lost by reason of the failure of appellant to comply with her contract. The appellant denied all the allegations of the complaint and set up that the cotton alleged to have been sold exceeded in value the sum of $30 and pleaded the statute of frauds. The alleged contract was made an exhibit to the complaint and over the objection of appellant was introduced in evidence as follows:

"Mr. Carter Murphy,        September 25, 1919.
    "City:

    "Dear Sir: This confirms purchase from you today of 200 bales of Mrs. Moore's staple cotton, as follows:

"100 bales first picked, f. o. b. Pine Bluff Compress, compress weight, 46 cents per pound.

"100 bales second picked, f. o. b. Pine Bluff Compress, compress weight, 45 cents per pound.

"Or the first 200 bales picked at an average price of 45½ cents per pound, f. o. b. Pine Bluff Compress, compress weights, we to take up freight bills.

"To be delivered as quickly as possible.

"Yours truly,

"Ziba Bennitt & Company, Inc.

"By Ziba Bennitt, Pres.

"Above accepted September 25, 1919.

"Carter Murphy."

Ziba Bennitt, the president of the appellee company, testified substantially as follows: That he had been dealing with Murphy with reference to appellant's cotton for about six years; that he had bought cotton from him nearly every season. Murphy generally solicited witness in connection with the selling of the cotton. In the present instance, Murphy told witness that he had some cotton for sale and asked witness what he would pay for it. Witness offered him 46 cents per pound for the first 100 bales picked and ginned and 45 cents for the next 100 bales picked and ginned of the cotton grown on the Fairfield place. In the sales and purchases the matter had never been taken up with appellant, but was consummated directly through Murphy. The cotton that Murphy sold to witness under the contract in evidence was grown on appellant's plantation at Fairfield. The checks that were made in payment for the cotton of former sales were made payable to Carter Murphy. In the dealings witness had with Murphy witness knew that it was appellant's cotton that he was buying. Witness supposed that he had made at least eight or ten purchases from Murphy before the one in controversy. For the last of these purchases, a check was issued to Carter Murphy in the sum of $35,000. The check was introduced in evidence. This check was endorsed by C. B.

Murphy to Merchants and Planters Bank with instructions to credit account of appellant, and the check was paid August 30, 1919. Witness supposed that Murphy was appellant's agent in all these dealings. In the purchase in controversy witness and Murphy agreed on a price that would average 45½ cents per pound. After witness and Murphy had agreed upon the terms of the sale, witness stated that he would confirm the oral contract in writing and asked whether he should address it to Mrs. Moore (appellant) or to Murphy, and Murphy replied to address it to him. Whereupon witness prepared the contract in evidence. There was no difference between this contract and other contracts made with Murphy except as to the price and quantity. The grade and staple of cotton produced on appellant's plantation at Fairfield was well known around Pine Bluff. It generally graded up to an average of 1¼-inch cotton, and witness understood at the time that he was buying cotton of 1¼-inch staple. Witness never received the cotton from Murphy, but ascertained that it was in compress and could have been delivered on October 29, 1919. Witness arranged to accept and pay for the same, but was advised by Murphy that appellant would not deliver the cotton at all. The market value of such cotton at that time in Pine Bluff was from 75 cents to 80 cents per pound. After that time it had ranged from 75 cents to $1 per pound. The recognized standard weight of a bale of cotton according to custom at Pine Bluff was 500 pounds. Murphy told witness that he was appellant's agent, and witness knew that he was her agent because she entrusted the handling of her business to him, and his authority to sell and collect for her cotton had never before been questioned. Witness did not know whether Murphy had consulted with appellant about these sales or not. Murphy seemed to have full authority in running the place and selling the cotton. The cotton sold was the Mary K. Moore cotton, and it was so stated in the contract. Witness had the cotton purchased under

the contract sold to spinners at 70 cents or better at the time appellant refused to deliver the same. All witness knew about Murphy's agency was from witness' dealings with him and the general understanding around Pine Bluff.

There was testimony of several other witnesses, over the objection of appellant, corroborating the testimony of Ziba Bennitt. Some of these witnesses had several times bought cotton belonging to the appellant grown on her Fairfield place from Carter Murphy. None of these deals had been made by the appellant herself, but were consummated solely through Murphy. One witness testified that the last check issued by his firm in such a transaction was issued to Murphy in payment of the cotton purchased from him belonging to appellant and that the check was endorsed by Mary K. Moore and Carter Murphy. One of the corroborating witnesses testified that he did not know whether appellant had authorized Murphy to make the sales or not.

The manager of the Cotton Oil Mill at Pine Bluff testified, over the objection of appellant, that for four years he had purchased cotton seed from Murphy from cotton raised on appellant's plantation at Fairfield. The accounts of the purchases were kept in the name of appellant. They were paid for by checks issued to appellant, and she receipted the vouchers for same. Witness had had no discussion with Murphy as to what authority he had to make these sales.

The manager of the Pine Bluff Compress and Warehouse Company testified that for seven years cotton belonging to appellant had been sent to the compress of which he was manager. It was grown on her Fairfield place. The warehouse receipts were issued to her where it was not sold before it was shipped in. The witness' instruction with reference to the samples and delivery of the cotton were in all instances from Carter Murphy, representing appellant, until the present year. During the year 1919 the 212 or 215 bales of cotton sent to the

compress from the plantation of appellant were consigned to her, but handled differently. Witness, during the early part of the season, had instructions from Murphy with reference to the cotton, but later appellant took the matter up with witness direct. Witness did not know whether during all the time the cotton was handled by Murphy through his own initiative or whether he was carrying out the instructions of appellant in each particular instance.

,, Another witness testified, over the objection of appellant, that he had been president of the Hammett Grocery Company and that for more than ten years he had sold supplies to the appellant to be used on her plantation at Fairfield; that most of his dealings were with Carter Murphy. The account of supplies and cotton was kept with appellant who paid for the same and received the pay for the cotton that was sold. The goods were paid for by checks signed by appellant. Murphy would place all orders, and the grocery company would deliver the same. Witness did not know whether Murphy ordered the supplies on his own initiative or whether he was authorized to do so by appellant.

It was shown on behalf of appellee by Carter Murphy that the first 200 bales of cotton grown on appellant's plantation at Fairfield were sent to the Pine Bluff Compress & Warehouse Company, and that this was the cotton that he agreed to sell to the appellee.

The appellant testified in her own behalf that she had owned the Fairfield plantation since 1893; that Carter and Clifton Murphy were her sons; that during this time she had attended to her own business. When she wanted anything done, she would have her husband or her sons attend to it for her. Neither Carter nor Clifton Murphy had authority to sell cotton or purchase supplies for the farm without first consulting her, and to her knowledge they had never done so. Carter had no right to transact any business for her except as directed by her in each instance. She never gave any one authority

to sell her cotton or cotton seed except when they first took the matter up with her, and that was the case in every one of the transactions with reference to the sale of her cotton and cotton seed, which the witnesses for the appellee had testified to. Carter had no authority to sell the cotton to appellee under the contract dated April 21, 1919. She first learned that he had signed the contract when he told her that Bennitt had brought suit against her for failure to deliver the cotton. She saw the contract before the suit was brought, the day before she was taken sick, and looked at it, but was busy at the time and laid it down. She thought it was a proposal to purchase her cotton. She was not ready to sell it at that time and didn't pay much attention to it. She had not signed any contract. She did not advise Bennitt that she was ready to sell after receiving the contract because the next day she was taken sick and was ill about a month, and when she got up she was advised that Mr. Bennitt had brought suit. She didn't think it was necessary to advise Mr. Bennitt, and she had never entered into an agreement for the sale of the cotton. She would not have sold the cotton at the price stipulated in the contract because it was not a fair price.

Witness Graham testified that he was in the business of selling cotton, and that cotton like that involved in the suit the 22d day of October, 1919, was selling for 43 cents per pound. This witness further testified that the market value of the best of appellant's cotton on October 29, 1919, was from 63 to 65 cents per pound, and that since October he had offered cotton as good as appellant's to the appellee for 61 cents. There was testimony on behalf of appellee in rebuttal to the effect that the cotton which Graham offered at 61 cents was inferior to appellant's cotton.

At the instance of the appellee, over the objection of appellant, the court submitted to the jury the issue as to whether or not Carter Murphy was the agent of the appellant, and whether or not as such agent he entered

into the contract with the appellee, and whether or not he had express authority to make such contract or was held out by the appellant as having such authority, and told the jury in considering these issues they could take into consideration the facts and circumstances introduced in evidence. The court also, at the instance of appellee, instructed the jury that if they found that appellant held Murphy out as her agent to sell her cotton and if the appellee had reasonable grounds to believe and did believe that he was such agent and dealt with him as such, the contract would be binding on the appellant. The court also instructed the jury that if they found for the appellee the measure of its damages would be the difference between the contract price and the reasonable market value of the cotton at the place and on the date that same should have been delivered with interest at 6 per cent. from that date.

The appellant contended that there was no testimony to show that Murphy was the agent of appellant to sell her cotton; that Murphy did not assume to act for appellant in making the sale, but if there was any such assumption of agency on his part it was wholly unauthorized by appellant and was not binding on her; that all former sales made by Murphy were by her special authority and were not evidence of any authority from her to make the sale in controversy. Appellant also contended that the contract alleged in the complaint did not fix any definite price for the cotton alleged to have been sold and that the contract was therefore void for uncertainty. Appellant prayed for instructions to be given the jury presenting her contentions which the court refused. There was a verdict in favor of the appellee in the sum of $24,175.42. A judgment was entered in appellee's favor for that sum, from which judgment is this appeal.

It is not claimed by the appellant that the cotton in controversy belonged to her son, Carter Murphy, and she does not dispute that she was the owner of the cotton

at the time the same was sold by her son. The first clause of the contract, towit: ''This confirms purchase from you today of 200 bales of Mrs. Moore's staple cotton'' shows that Murphy was not acting for himself in making the sale, but that he was selling cotton belonging to the appellant. The contract itself, therefore, shows that Murphy was assuming to act as an agent in making the sale and that he revealed the name of the person or principal for whom he assumed to act. It occurs to us that this is the plain purport of the contract, but, if we are mistaken in this, then the contract, to say the least, was ambiguous in this respect, and the court was warranted in allowing oral testimony on the issues as to whether or not Murphy in making the sale was the agent of the appellant and whether or not he had authority, real or apparent, to make such sale. In determining such issues parol evidence was admissible. *Boren* v. *Schweitzer,* 117 N. E. (Ind.) 526-27, and other authorities there cited; *Davis* v. *Lynch,* 65 N. Y. Sup. 225; *Arkadelphia Milling Co.* v. *Campbell,* 141 Ark. 25.

While the relation of agent and principal can not be presumed and can not be established by the acts or declaration of the agent in assuming authority, yet such relation and the authority of the agent, after the relation is proved, can be shown by circumstances as well as by positive proof. See *Wales-Riggs Plantation* v. *Grooms,* 132 Ark. 155; *Daly* v. *Arkadelphia Milling Co.,* 126 Ark. 405; *Wales-Riggs Plantation* v. *Dye,* 105 Ark. 446. There was testimony on the part of the appellee tending to prove that Murphy, for several years prior to the alleged sale in controversy, had been selling the cotton of appellant grown on her Fairfield plantation. While the appellant testified that in each case she had expressly authorized her son, Carter Murphy, to make these specific sales, nevertheless the fact that many sales of this character had been made from year to year, which she expressly approved, were circumstances from which the jury might have found that the relation of principal and

agent did exist between the appellant and her son, Carter, and that the latter was authorized by her to make the sale of the cotton in controversy. Without arguing the facts in detail, we are convinced that the testimony was sufficient to warrant a finding that appellant had constituted her son her general agent for the purpose of making sales of the cotton grown on her Fairfield plantation. But, if he did not have express authority to make the sale of the cotton in controversy, she had, by her course of conduct in not challenging any of the sales that had been previously made by him, held him out and clothed him at least with apparent authority to make the particular sale here under review. Appellant, in her testimony, admitted that she had specifically conferred authority upon her son to make similar sales in past years. One of these sales was consummated, as shown by the check introduced in evidence, a little less than a month before the sale in controversy. She only denied that he had authority to make the particular sale in controversy. The appellee, who was a party to many of these transactions and cognizant of others, had the right to conclude that Carter Murphy had the authority to make the sale in controversy. *Robinson & Son* v. *Geyer & Adams,* 107 Ark. 322; *Oak Leaf Mill Co.* v. *Cooper,* 103 Ark. 79; *Three States Lumber Co.* v. *Moore,* 132 Ark. 371; *People's Life Ins. Co.* v. *Kohn,* 100 Ark. 240; *Chalmers & Son* v. *Bowen,* 112 Ark. 68; *Railway* v. *Bennett,* 53 Ark. 208; *Mechem on Agency,* §§ 282-283. The trial court was guided by the principles announced in the above authorities in the giving of instructions and the admission of testimony. There was no error in the ruling of the court in giving the instruction on the measure of damages. *Arkansas Short Leaf Lumber Co.* v. *McIntirff,* 134 Ark. 284; *Westbrook Grain & Commission Co.* v. *Johnson,* 134 Ark. 300.

The provisions of the contract with reference to the price of cotton showed that the parties contemplated that, if the cotton were delivered in two lots as it was picked.

appellant should receive for the first lot 46 cents per pound and for the second 45 cents per pound; or, if the entire 200 bales were delivered in one lot, she should receive 45½ cents per pound, or the average price for the entire 200 bales. It is the duty of the court to construe the contract, if possible, so as to effectuate the intention of the parties. 13 C. J. 539; 2 Williston on Contracts, 1202 (Sec. 620). The court was correct in refusing to grant appellant's prayer asking that the contract be declared void for uncertainty. There is no reversible error in the record, and the judgment is therefore affirmed.

DISSENTING OPINION.

McCULLOCH, C. J. The conclusion reached by the majority that the contract for sale of the cotton discloses on its face the agency of Carter Murphy for appellant is, it seems to me, an erroneous construction of the contract. Of course, there is abundant testimony tending to show that it was intended by appellee and Murphy as a sale of the cotton by Murphy as agent for appellant. But, when we look alone to the face of the contract, it seems to me clear that it was not one for sale by the agent. On the contrary, its clear import is to show a sale by Murphy himself. The words "200 bales of Mrs. Moore's staple cotton" is merely descriptive of the subject-matter of the contract, and the use of those words does not imply that the sale was being made by Murphy as agent for appellant. It was, on its face, in other words, the individual contract of Murphy, and not the contract of Murphy as agent for appellant. That being true, there was no question of apparent or implied agency involved in the case, for, since appellee accepted the contract showing on its face that Murphy was acting for himself, it can not be heard to say that it dealt with him upon the faith of the apparent agency for appellant. *Arkadelphia Milling Co.* v. *Campbell,* 141 Ark. 25; *Cream City Glass Co.* v. *Friedlander,* 84 Wis. 53; 2 C. J. 682.

It seems to me that there is no ambiguity in the contract, but, even if the language of the contract be treated

as ambiguous with respect to the question whether it was the individual contract of Murphy or the contract of Murphy as agent for appellant, still appellee can not assert a claim against appellant on the basis of implied or apparent agency, for, in the absence of an express contract showing that appellant was to be bound as principal, appellee is not entitled to assert liability of appellant on the ground that he was induced to contract upon the purported agency of Murphy. The trial court, therefore, erred in submitting to the jury the question of implied agency or the apparent scope of the agent's authority.

I am also of the opinion that there is no evidence at all to justify a submission of the question of actual agency. Of course, an agency can not be established by the declaration of the person who assumes to act as such agent, nor can it be presumed from the fact that the person did so assume to act as agent. That has been decided so many times that it is unnecessary to cite authority on the subject.

All that we have in the case that might be said to have a tendency to establish the authority of Murphy to sell appellant's cotton was the fact that Murphy had in many instances made sales of cotton for appellant. It is settled doctrine that where an agency is once established it is presumed to continue as long as the agent assumes to act in that capacity without notice from the principal to the contrary. But that rule should not be applied under the facts in this case, for the acts of agency on the part of Murphy were too far apart and too remote from this particular act to raise the presumption of unbroken continuation of the agency. All that was proved in this respect is that from year to year Murphy made sales of cotton for appellant. She testified that he had no general authority to act for her, but that in many instances she authorized him to make sales of certain lots of cotton. This doctrine of presumption of continuation of agency ought not to be applied to acts

extending from year to year, like selling the annual products of a farm. It seems to me to be a dangerous doctrine to say that when a farmer employs a cotton dealer to sell his crop of cotton during a given year, or from year to year, it raises a presumption of continued agency during succeeding years. Neither is there any proof of ratification by appellant of the unauthorized sales made by Murphy. Appellant herself testified that in each instance when sales were made she gave express authority to her son, Carter Murphy, for that purpose, and there is no other testimony to contradict her statement. But, if her testimony be entirely disregarded, there is no other testimony tending to show that Murphy, in the previous sales of cotton made by him for his mother, acted without authority. The doctrine of ratification only applies where there is a previous unauthorized act. And where such ratification repeatedly occurs it may warrant the inference of continued agency.

Stress is laid upon the fact that appellant saw a copy of appellee's letter to Murphy, but according to the undisputed evidence the copy she saw was not signed by Murphy, and she stated that she did not know that the latter had signed the contract, and understood that this letter was merely a proposal from appellee to purchase the cotton. This did not constitute a ratification or adoption of the contract, unless she was informed that Murphy had accepted it by signing the contract. She was not called on to act in any way or to repudiate the act of her son until she received information that he had undertaken to bind her to a contract of sale.

I am therefore unable to discover any evidence in this case sufficient to justify the finding that appellant either authorized the sale or ratified it or that she committed any act which would warrant any one dealing with Murphy to assume that he was her implied or apparent agent. Murphy was not clothed with any *indicia* of authority. The cotton was not sold by sample, as is customary in sales of cotton, for at the time this contract

was executed none of appellant's crop of cotton had been gathered. This was a sale in advance of the harvesting of the crop, and all that appellee has to rely on is to show that Murphy had sold his mother's cotton raised during the previous years. I think this is not sufficient to establish agency.